UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

GERALD PIERCE

plaintiff

**07 CA 11305 PBS**

v,

C.A. NO _____

MAUREEN WALSH, et al,

defendants

MAGISTRATE JUDGE _Bowler_

et al defendants: Claire Hooley, Debra Mc Donough, Thomas Merrigan, Harry Barnes, Grey Nyman, John Doe #1, John Doe #2, Diane Kennedy, former Dept. Of Correction Commissioner Kathleen Denny, former Governor Mitt Romney, Andrew Doe #1

U.S. DISTRICT COURT
DISTRICT OF MASS.
2007 AUG 13   A 11:56
FILED
CLERKS OFFICE

## A CIVIL RIGHTS ACTION under 42 U.S.C.S. § 1983,

seeking total damages of $36,000,000.

The Parole defendants are represented by Heather Hall (12 MERCER Road, Natick, Ma. 01760). Kathleen Dennchy is represented by David Slade (70 Franklin St. Boston, Ma. 02110 -1300).

Former Gov. Mitt Romney and Andrew Doe #1 are represented y Atty. General Martha Cookley (ONE ASHBURTON PLACE, BOSTON, MA. 02108).

The Pro se, forma pauperis plaintiff's address is P.O. Box 8000, shirley, Ma. 01464

submitted by the plaintiff,

_Gerald Pierce_

Gerald Pierce #W3-388
P.o. Box 8000
SHIRLEY, MA. 01464

DATED: July 9, 2007.

UNITED STATES DISTRICT COURT.

DISTRICT OF MASSACHUSETTS

GERALD PIERCE,

                petitioner

       v.

Maureen Walsh, et al

           defendants

**07 CA 11305 PBS**

C.A. No. _____

# INTRODUCTION

Due to childhood abuse the plaintiff suffers from the neurogenic, mental-health condition known as "Shy Bladder" syndrome,

This condition prevents the plaintiff from safely and consistently providing a urinalysis sample under the "Direct Observation" collection method ( a "monitor" stands next to the testee and directly observes the flow of urine from the genitalia into the collection bottle).

(1)

The Department of Correction (hereafter, the "DOC") has a thoughtful and humane drug testing policy that allows inmates with my condition to prove that we are not taking drugs. This constitutionally protective policy, 103 DOC 525.03, provides for several "alternative" collection methods. ①

The method I use (and which is the DOC's first alternate choice because it is the cheapest one and utilizes the existing equipment) is known as the "Dry Cell" method.

① the "NORMAL" collection method is via "DIRECT" observation. If an inmate is unable to provide a "sample" within two hours he is considered as "Refusing" to provide a sample. He is then subjected to sanctions including a transfer to a higher custody level and monetary penalties.     (2)

In the Dry Cell method, the testee is taken to a cell without running water. He is then strip searched and locked into the cell with only his underwear and the sample container. He is then left alone to provide the sample in a humane and dignified way. If — at the end of two hours — the testee is still unable to provide a sample, he is then tested via an "ORDC" swab or "hair" assay method. In either case, the inmate is given a chance to prove that he is not taking drugs.

In August of 2004, the plaintiff, while an inmate at North Central Correction Institution ( hereafter, "N.C.C." ), was granted a parole.

(3)

The Parole Board members who granted parole were the defendants Hooley and McDonough. Also attending was the defendant, Institutional Parole Officer (IP) Greg Nyman.

One of the conditions of the parole was that the plaintiff "consent" to be "supervised" for drug and alcohol use. It was not explained to the plaintiff what this "supervision" would consist of; however, because the ~~defendant~~ plaintiff was (then) currently being "drug tested," he assumed the supervision would include drug testing. He further assumed that the drug testing would be conducted under the DOC policy of <u>103 DOC 525.03</u> (with it's alternative "collection" methods).

(4)

Because the plaintiff is homeless he was not immediately released on parole. He was not released until the following December. On December 2, 2004, the plaintiff was released, on parole, to the Brooke House halfway house (107 Park Drive, Boston, MA.

According to parole guidelines, on the day plaintiff Pierce was released on parole, it was IPO Nymo's (Job) responsibility to meet with the plaintiff and explain to him all the conditions of parole. It was incumbent upon IPO Nyman to explain to th plaintiff that drug testing would be via the "Direct" observation method. In fact, IPO Nyman did n meet with the plaintiff at all, and nobody explained the conditions of parole.

(5)

The Brooke House is a halfway house that is under contract with suffolk county and the Commonwealth Even though the plaintiff was "on parole" while at Brooke House, he was still an "inmate" (in ever legal definition of the word) and Brooke House had the legal responsibility to drug test him via the DOC policy (103 DOC 525.03) with it's "DRY" ce alternative, and not according to the PAROLE Department (hereafter, the "DOP") with it's draconian "Direct" observation requirement.

On the plaintiff's fiest day of parole he appearred at the Quincy branch of the Parole Dept., His assigned Parole Officer (PO), Harry Barnes, was not in.

(6)

Instead, his " Intake " interview was conducted by an unknown DOP official, hereafter Referred to as John Doe # 1 ( his identity can be discovered by the production of the Intake Interview, itself, which contains his affixed signature).

During the course of the interview the plaintiff informed John Doe #1 of his childhood abuse and made a specific Request to be drug tested via the "Dry" cell method or any other alternative method that was acceptable to the Parole Dept. This Request was denied, and only then was the plain-tiff informed that urinalsis was conducted by the " Direct " observation method,

Later that same day, the plaintiff (hereafter, "Pierce")
met with his Brooke House case-manager, Margarita
Winnell. He explained to her about his childhood
abuse and requested her assistance in obtaining an al-
ternative collection / testing method. She expressed her
sympathy and — her personal wish — that all
her clients could be tested via the "OROC" swab test.
However, she stated that testing had to be done via
the "Direct" observation method. She then gave
Pierce additional bad news : instead of the
"Random" testing schedule that most parolees must
consent to (and under which most parolees are tested
only once a year), he would be tested _every_
week, every Thurs. eve / Fri. morning, shortly after
midnight.

(8)

The following Thur. eve / Fri. MORNING ②, at shortly after midnight Pierce was approached by a male staff member of Brooke House. At this time his identity is unknown to Pierce, and he will be referred to as John Doe # 2. Because Pierce had advance warning that he would be tested, he drank approximately eight 12 ounce glasses of water immediately before the test (about 10 to 15 minutes prior to the test). Pierce had hoped that by drinking such a copious amount of water he would have been able to "force" the urine past his "Reluctant" kidneys / bladder Drinking huge amounts of water, in short periods of time, leads to a dangerous medical condition know as "Water Intoxication". Water Intoxification

② December 9 - 10th.          (9)

CAN
AWS lead to verified cases of "coma" and even

deaths. Most Recently, earlier this year when a

Sacramento women died from water Intoxification

while Trying to win a Radio contest.


John Doe #2 brought plaintiff to the bathroom where

the "collection" would take place. John Doe #2

stood approximately eight feet to the immediate right

of Pierce, where he had an unobstructed and "direct"

view of the plaintiffs genitalia. Pierce was unable

to provide a sample at this first attempt. In future

pleadings with the court he will describe the "mental"

and "physical" "Torture" it is for him to try

to provide a sample under these "Direct Conditions."

3) He has previously described it to the defendants ③
in a letter on or about Dec 17, 2004 ( 10 )

and their lawyers.④ For now, the court can rely on the medical literature that Water Intoxication can lead to "Coma" and "Death" as "prima facie" evidence of the "torture" it is for guys like me, with my neurogenic condition, to submit to Direct; Observed urinalysis.

After a fifteen minute break — during which I consumed even *more* ~~liquid~~ liquid — I was finally and *blessedly* able to "force" the sample through. It was a mental and physical torture for me to do so,

④ In written submissions in PIERCE v. Dennehy, et al, Suffolk Superior Court, SUCV.- 2006- 2985 -H — still pending at this time.

(11)

But my ordeal had only just begun. Because I am an

older man with a prostrate gland that is the size of

a grapefruit, I was hopping down from the top-

bunk every 10 minutes to release a pitiful stream of

urine. This, alone, kept me awake all night long and

would not have been in " physical" (enough) shape t

go to work the next day ( if I had a job ). However,

there is also the " mental Health" aspect of my neurogenic

condition and I ( irrationally ) immediately began to

worry about my next drug test — a week away.

This evening began a two week period of worry, anxiety,

self-doubt, shame, and sleep-deprivation that led to

a deterioration of my mental health ( Shy bladder

syndrome is a mental Health condition, after all ).

(12)

Later that Friday morning I met with Margarate Winnel and told her about my ordeal. I again asked to be tested via an alternative method. My request was denied.

Later that Friday morning I met with the the NURSE-PracTioneR(5) who administees the health clinic at the St. Francis House day Shelter for the homeless. I told her about my embarrassing condition. As a health-care professional she was familiar with the Shy Bladder Syndrome and Water Intoxification threat. The kind Nurse-Practicioner offered to administer any alternative drug test that was acceptable to the DOP.

(5) I have since forgotten her name.

The following Thur./Fri. morning, Dec.16.2004, I was again required to provide a sample for urinalysis. This time I drank even _more_ water but was still unable to provide a sample for John Doe #2 as he directly observed my attempt. Like the previously week, I then took a 15 minute break and consumed even more water. I was finally able to provide the sample during my second attempt.

Like the previous week, I spent the Rest of the evening jumping out of bed to run to the bathroom every ten minutes except this time it was even worse because I had drunk even more water. I also spent the rest of the evening irrationally worrying about the next drug test scheduled for the following week.

(14)

Later that Friday morning I met with Margarita Winnell and, again, explained that it was becoming an even bigger ordeal for me to comply with the Directly observed drug test. I told her I would rather be returned to prison (where I could, at least, prove I wasn't taking drugs via 103 Doc 525 03) than to remain on parole and to have to go through this ordeal every week. My physical and mental states were deteriorating at an exponential rate. Ms. Winnell cautioned me to be patient and told me she would contact PO Barnes to seek a solution to this problem.

Later that morning I wrote a letter to PO Barnes and the Boston Regional (15) Parole Supervisor.

In my letter I explained to them about my childhood abuse and the Shy Bladder Syndrome, I explained to them — in graphic terms — what a mental and physical torture it was for me to comply with these Directly Observed urine samples. I Relayed the Kind Nurse/Practioner's offer to administer any alternative drug test that was acceptable to them. I asked for their Relief and I asked them — if they did not have the authority to grant Relief — to forward my letter to Police Board Chairman Maureen Walsh.

I gave the letter to Margarita Winnel. She made a copy for her files and then faxed a copy to PO Barnes and his Regional supervisor at their office in Quincy. (16)

The next day, Saturday, December 18th, she received a phone call from PO Barnes in response to my letter. My request for relief was denied. Even worse, I was told to report to the PPROLE Office the following Thursday to provide my next sample under PO Barnes "Direct" observation.

Due to my deteriorated mental state, I believed that the order to appear at the Quincy office was because Parole had wanted me to be unable to provide a sample within the two-hour deadline so they could have a justification to return me to prison. This "paranoid" fear that PPROLE would _want to_ return me to prison was ground in "fact."

(17)

Pierce could not understand the reason(s) for the DOP's

refusal to offer him an alternative drug test ; he only

knew that such a decision lacked commonsense and decency.


Despite Pierce's deteriorating mental state ( or, perhaps,

because of it ) he felt he had one other chance to obtain

the alternative testing : Because the Parole Board is

under the direct control of the Executive branch, he

would appeal to Governor Romney. Pierce spent the

next 3-4 days writing a lengthy letter ( 20 + page )

to the governor, explaining the childhood abuse and the

ensuing Shy Bladder Syndrome. He related that the DOC

had it's compassionate ( and constitutionally protective )

alternative policy , <u>103 Doc S25.03</u> , and that

(18)

the DOP had it's draconian Direct Observation requirement.

Pierce (rhetorically) asked how it was possible that

two departments of the same (Dept. of Public Safety)

agency could have such opposing policies. He

described, in graphic detail, the torture it is for

him to try to comply with the Directly Observed

collection method. He made the common sense argument

that for the DOP to insist upon the Direct

Observation method was cruel, lacking in common

sense, and a waste of the taxpayer's money ( it ho.

cost the Taxpayers over $100,000, to incarcerate

me for the rest of my term — versus the

minimal expense of keeping me on parole).

on Wednesday, December 22, 2004, ( the day before

he was scheduled to appear at the Parole Headquarters

to provide a urinolysis sample under P.O. Barnes'

Direct Observation ), Pierce appeared at Governor

Romney's Beacon Hill office with his lengthy letter.

The Governor was not in but Pierce spent nearly an

hour with a Governor's aide named "Andrew." The

Aide read Pierce's letter and asked related questions

but was unable to be of any assistance ( Pierce had

hoped the Governor's office would have required the

DOP to offer Pierce 103 DOC 525.03). "Andrew

gave Pierce the ( most un-Republican - like) advice

of ≡: Get you a lawyer≡ .